# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LAUREL A. BURKHOLDER, | ) | Case No. NO. 3:20-cv-00664-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| ANDREW SAUL, Commissioner | ) | |
| of Social Security | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I. Introduction

Laurel Burkholder, Plaintiff, seeks judicial review of the final decision of Andrew Saul, the Commissioner of Social Security. The Commissioner denied Burkholder's application for disability insurance benefits under Title II of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the ALJ followed proper procedures and her decision is supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

## II. Procedural History

### A. The First Decision

Burkholder protectively filed for disability insurance benefits on May 27, 2014, claiming a period of disability beginning on September 3, 2013. (ECF No. 14, PageID #: 92). The Ohio Division of Disability Determination (the "State Agency") initially denied Burkholder's claim on September 2, 2014. (ECF No. 14, PageID #: 92). The State Agency denied it again on November 19, 2014. (ECF No. 14, PageID #: 92). On January 9, 2015, Burkholder submitted a written request for a hearing before an ALJ. (ECF No. 14, PageID #: 92). ALJ Carrie Kerber presided over

Burkholder's hearing on March 8, 2017, by video. (ECF No. 14, PageID #: 92). Burkholder appeared through attorney Clifford Farrell and testified. (ECF No. 14, PageID #: 111-41). Joseph L. Thompson testified as an impartial vocational expert. (ECF No. 12, PageID #: 141-45).

The ALJ issued her decision on March 30, 2017. (ECF No. 14, PageID #: 92-102). She determined that Burkholder was not disabled under the Social Security Act. (ECF No. 14, PageID #: 92-102). Burkholder timely asked the Appeals Council to review and set aside the ALJ's ruling, but the Appeals Council denied Burkholder's request on May 8, 2018. (ECF No. 124, PageID #: 77-79).

### B.  District Court and Appeals Council Remands

Burkholder filed an action before this District on July 9, 2018. *See* Docket for 3:18-cv-01561-JJH. After Burkholder filed a brief in support of her allegations, Burkholder and the Commissioner jointly moved on January 30, 2019, to remand the case to the Commissioner under sentence four of 42 U.S.C. § 405(g). *Id.* at ECF No. 14. The court ordered the case remanded the next day. *Id.* at ECF No. 15.

The Appeals Council then remanded Burkholder's claim to the ALJ for additional consideration. (ECF No. 14, PageID #: 773-75). Specifically, the Appeals Council concluded that the ALJ had "not properly evaluate[d] the evidence related to [Burkholder's] headaches." (ECF No. 14, PageID #: 773). The Appeals council noted that while the ALJ stated that Burkholder had used only over-the-counter medicines to treat her headaches, the record reflected that she had been prescribed and used stronger medicines. (ECF No. 14, PageID #: 773). Similarly, the Appeals Council noted that the ALJ's finding concerning the frequency at which Burkholder experienced headaches was unsupported, as the evidence reflected more frequent episodes. (ECF No. 14, PageID #: 774). And the Appeals Council disagreed with the ALJ's statements about Burkholder's

ability to perform daily activities, noting that her statements and the record evidence were not inconsistent in the way that the ALJ said they were. (ECF No. 14, PageID #: 774). Finally, the Appeals Council noted that while "the absence of objective evidence is a legitimate reason to discount the severity of a claimant's alleged complaints," which the ALJ pointed out here with "several MRIs of the brain [that] were unremarkable and … also … a normal EEG," nevertheless "remand is necessary given the aforementioned decisional deficiencies." (ECF No. 14, PageID #: 774). The Appeals Council thus ordered the ALJ on remand to:

- Give further consideration to the severity and limiting effects of the claimant's migraine headache impairment;

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 85-16 and 96-8p); [and]

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 85-15).

(ECF No. 14, PageID #: 774-75).

## C.    The Second Decision

ALJ Kerber presided over Burkholder's remand hearing on October 30, 2019, again by video. (ECF No. 14, PageID #: 694). Burkholder again appeared through attorney Clifford Farrell and testified. (ECF No. 14, PageID #: 724-34). Charlotta Ewers testified as an impartial vocational expert. (ECF No. 14, PageID #: 734-38).

The ALJ issued her new decision on November 29, 2019. (ECF No. 14, PageID #: 694-712). She again determined that Burkholder was not disabled under the Social Security Act. (ECF No. 14, PageID #: 694-712). This appeal followed. (ECF No. 1).

### III.     Relevant Background

Burkholder does not argue that the ALJ impermissibly parsed the record. Thus, the ALJ's comprehensive narratives of the relevant hearing testimony, medical evidence, and opinion evidence provide sufficient background of Burkholder's claim for this appeal.

### A.     Burkholder's Hearing Testimony

The claimant alleges, in the Adult Disability Report, that she is unable to work due to headaches, confusion, and disorientation. (Exhibit 2E/2) The claimant initially appeared and testified at a hearing held on March 8, 2017. At this hearing, the claimant testified that she has chronic headaches 3-5 times a week and she can only do work for 15-20 minutes at a time. The claimant further stated that her headaches last for 7-8 hours and even up to 10 days. She stated that she must lie down and cannot do anything when she has a headache. The claimant also stated that she was able to cook meals, go to her children's school events, read, and performs household chores albeit on good days. The claimant also testified that she worked after her alleged onset date, stocking shelves, but only for a few weeks.

After the case was remanded, the claimant appeared and testified at another hearing on October 30, 2019. She testified that since her last hearing, she has been diagnosed with degenerative disc disease of the lumbar spine. However, she indicated that her back pain has decreased since losing weight. She is presently 5'5" tall and weighs 173 pounds. She reported that back pain is sporadic and is exacerbated by standing for long periods while doing chores such as washing dishes or cooking. She indicated that she could stand for approximately one hour before experiencing back pain. She presently treats her back pain with Tylenol. As to her headaches, she testified that she has headaches three to five times weekly. However, she has noticed that with regular exercise, the length of time her headache persists is reduced. She testified that her headaches would formerly last for eight hours or days and with exercise they have reduced to two to seven hours. Her exercise routine consists of walking mostly and she does some upper body weight training including curls and chest presses on a weight machine. She testified that she is able to lift anywhere from 10 to 40 pounds with her upper body on the Nautilus machine.

The claimant further testified that she takes medications including Trazadone, Omeprazole, Cylcobenzaprine, Mobic, Vitamin D, and

occasional over the counter Tylenol. (see also Exhibit 23E) She indicated that there are no medications for her to take regarding her headaches, and she has tried several medications over the years. However, she was asked at the hearing regarding a treatment record from her former provider at Cleveland Clinic that recommended she treat with a local neurologist and start trial medications for her headaches. She indicated that warnings about the side effects from the medication persuaded her not to take the medication and she has not started treating with a local neurologist because the only thing they would recommend would be the medication that she does not want to take due to the potential side effects. The claimant further testified that her quality of sleep is impacted by her headaches. However, on average, she gets a decent amount of sleep. She reported that when she has a headache, noise and light exacerbate her headache further and she tends to avoid[] both. She could not identify any specific triggers that cause her headaches. She testified that in the last few years she has experienced headaches 3-5 days a week, which is reportedly a reduction in comparison to prior years. She further clarified that she does not have migraines[,] but she has 'new daily persistent headaches' as diagnosed by her provider(s). She was told that these type of headaches do not show up on diagnostic tests. At the hearing, she testified that she indicated that she was experiencing a headache which she rated a 2 on a scale of 10. She reported that she never experiences pain less than a 2 and her persistent headaches are always there and irritating. However, her headaches can cause pain that she rates at a 6 or 7 on a scale of 10. During these headaches, she is able to do laundry and dishes, pieced out throughout the day, and she lies down. As to her mental health, she indicated that working out helps her disposition. She has also been prescribed Vitamin D, which helps with her depression. Lastly, she testified that she does not believe that she could perform a job eight hours a day, five days a week, because she has not gone five days without a headache. (see hearing testimony)[.]

(ECF No. 14, PageID #: 700-01).

**B. Medical Evidence**

**1. New Daily Persistent Headaches**

An MRI of the claimant's brain in September 2013 showed an essentially unremarkable appearance of the brain, unchanged from previous. (Exhibit 1F/42)[.]

In October 2013, the claimant was treating with Kristine Kaufman,[1] CNP[,] regarding her anxiety. She reported that she was having difficulty sleeping and concentrating. In addition, she reported feeling confused. However, she denied suicidal ideations. After a brief exam, the claimant was prescribed Celexa 20 mg and was advised to remain off work until November 10, 2013 so that she could get her anxiety under control. (Exhibit 1F/25-27 and 31)[.]

Treatment notes from the emergency department at St. Rita's on December 20, 2013, indicate that the claimant was assessed with post herpetic neuralgia pain and acute alcoholic intoxication. No rash was visualized[,] and she had no evidence of herpetic lesions on her face. William Tucker, MD, the attending physician noted that she originally presented to the department for suicidal ideations. She denied suicidal ideations but reported that she was tired and wanted to sleep and would not mind being dead to take care of the pain. She further reported having post herpetic neuralgia pain. Upon arrival, she was noted to have an ethanol level of 0.23, which she admitted to drinking to help with sleep and pain. On exam, she was noted to appear nervous/anxious and appeared to be intoxicated. The claimant was administered Ativan and Neurontin for pain control. Dr. Tucker noted that it was unclear whether the claimant had underlying post herpetic neuralgia, substance abuse, or both. (Exhibit 3F/56-57 and 58-59) She was given a prescription for Gabapentin and a limited prescription for Ativan and was cleared for discharge. (Id.)[.]

In January 2014, the claimant presented for an appointment with Kristine Kaufman, CNP. She reported that she was experiencing headaches for which she was taking Motrin and drinking alcohol to help with the pain. She further reported having occasional nausea for weeks and indicated that the headache was constant causing her difficulty sleeping at night. She described her headache as being on the right side of her head with numbness and radiation from her neck down to her shoulder. She further noted that she was also having difficulty concentrating. The claimant admitted to the provider that she had been drinking a lot over the past six weeks due to her headache pain. Physical exam findings were unremarkable. The claimant was assessed with a headache for which she was administered Toradol 30 mg and was prescribed Trazadone to help with her sleep. In addition, she was referred to neurology and

---

[1] The ALJ spelled Kaufman's name as both Kaufman and Kauffman in her decision. (*E.g.* ECF No. 14, PageID #: 707). The ALJ also referred to Kaufman as Kris (PageID #: 705), Kristine (*e.g.* PageID #: 706), and Kristina. (*E.g.* ECF No. 14, PageID #: 706). It appears that they are the same individual.

6

psychology for further evaluation. (Exhibit 1F/19-21)[.]

On or about April 15, 2014, the claimant presented to the emergency department at St. Rita's Medical Center requesting alcohol detoxification. She reported that she had been drinking for six months due to a chronic right sided headache. She reported drinking a half gallon of liquor daily and last consumed alcohol in the last 27 hours. On exam, she was observed to be shaking, tachycardic, and nervous. (Exhibit 3F/29-30) She was administered Ativan and her anxiety improved. Her high blood pressure and tachycardia also resolved in the emergency department. Her alcohol level was noted to be less than 0.01. The claimant was admitted for alcohol withdrawal. (Exhibit 3F/30-32) During her admission she was examined by Sohrab Dadfar, PhD. She reported that she was initially on pain pills and once she stopped taking them, she started drinking again. She reported drinking quite heavily and admitted drinking a half gallon jug of Tequila over the course of a couple days. (Exhibit 3F/41) The claimant was assessed with alcohol dependence for which she was to continue with outpatient treatment and was strongly urged to attend AA meetings. (Exhibit 3F/41-42)[.]

After three days of hospitalization, Dr. Perry Hux, noted that the claimant displayed some personality issues for which she had not sought out psychiatric treatment. She was discharged to home with a prescription for Trazadone 100 mg at bedtime and she was encouraged to seek out psychiatric treatment and intensive drug/alcohol treatment through Pathways. (Exhibit 3F/35)[.]

Treatment notes from Kristine Kaufman, CNP, later in April 2014 indicate that the claimant had recently detoxed at the hospital for three days. Following her discharge, she started having headaches and shaking. She reported that she had been sober for one week. She further indicated that she had been drinking due to head pain and to help her sleep. The claimant was assessed with new onset of headaches for which she was prescribed Topamax. The claimant was to follow up in three weeks regarding the effectiveness of Topamax, she was not to take any Tylenol, and she was to attend an appointment with a neurologist for further evaluation. (Exhibit 1F/7-8)[.]

During May 2014, the claimant was initially examined by Ali Almudallal, MD, a neurologist at Lima Neurology. She reported having right-sided unilateral, occipital, temporal pain that she rated ranged from 2-10 on a scale of 10 lasting one day. She reported that the headaches were occurring three times a week and were accompanied by nausea, vomiting, mental status changes. On

examination, she appeared anxious and initially made poor eye contact. A neurological exam was grossly normal and there was no limitation of range of motion of the neck. She reported that Topamax was not helping and her reported frequency of headaches justified preventative medications. Medication options were discussed and it was determined that she should remain on Topamax and was to start Lamictal. In addition, an EEG was ordered and she was to keep a headache diary. (Exhibit 2F/1-4) An EEG later showed normal results with no evidence of epileptiform activity appreciated. (Exhibit 2F/5)[.]

On June 15, 2014, the claimant presented to the emergency department at St. Rita's due to a headache and suicidal thoughts after her daughter called the police to bring her in. She reported that she was having suicidal thoughts provoked by her chronic headaches that were ongoing for nine months. She further reported poor sleep due to pain and indicated she was not taking the medications because she could not afford them. She rated her continuous pain to be a 10 on a scale of 10. At the time of the examination, she denied any suicidal ideations. On exam, she was noted to have a normal mood and affect and her behavior was normal. She indicated that she did not want any narcotics and wanted to go home, as it was not her choice to come. The claimant was administered Toradol, Imitrex, Reglan, Ativan, and Fiorcet. It was determined that she did not require admission and she was discharged to home with a prescription for Fiorcet. She was advised to follow up if her symptoms persisted. (Exhibit 3F/13-18)[.]

In the same month, the claimant reported having a headache for one week which she reported was her worst headache ever. She reported the headache was sharp, severe pain. She further indicated that the headache was accompanied by nausea, photosensitivity, tingling or numbness, visual disturbances, and vomiting. On examination by Kristine Kaufman, CNP, she was alert and oriented x4 with normal findings. The claimant was administered Toradol 30 mg for her pain and was directed to follow up with neurologist regarding her headache/migraine headache. (Exhibit 1F/1-5)[.]

She later followed up with Dr. Almudallal that month. She reported that her headaches had increased and were accompanied by nausea and vomiting. She reported that the headache persisted constantly causing her to be irritable and sleep poorly. On exam, the claimant was alert, cooperative and anxious. She exhibited 5/5 strength throughout, her gait was intact, and she had good range of motion in her lumbar spine. It was noted that she had discontinued use of Lamictal because it had caused a rash. The claimant was started on

8

Depakote 500 mg ER daily, was to consider a tertiary center referral, and was to have an updated MRI of her brain. (Exhibit 2F/6-7) An updated MRI in July 2014 showed unremarkable MR appearance of the brain. (Exhibit 2F/8-9 and 3F/10-11)[.]

In August 2014, the claimant was examined by the consultative examiner, Albert Virgil, PhD. When asked about why she could not work she reported that she had intractable headaches that last for two hours or up to ten days. She reported that when she has a headache she tries to sleep as much as she can and when she does not have a headache she tries to clean up the house and prepare meals. She reported being able to shop and cook independently when she does not have a headache. She reported her hobbies include reading and she spends times sitting and listening to music with friends. On exam, she appeared to be well groomed and she related in a passive manner. Her mood was observed as depressed and she endorsed worrying about bills. Dr. Virgil noted that she did not present with anxiety disorder symptoms. She maintained adequate attention during the exam[,] and she exhibited freedom from distractibility. Her remote and recent memory appeared to be intact and she presented with adequate ability to make sound, common sense judgments. Her overall intelligence was estimated to be within the average to high average level. The claimant was assessed with adjustment disorder with depressed mood. (Exhibit 4F)[.]

The following month, the claimant reported to Dr. Almudallal that her headache frequency and severity was improving to less than three headaches weekly. She reported being headache free during the appointment and reported having been sober since April 2014. During an examination, the claimant was noted to have an anxious affect. She was further noted to have mild action tremor noted during a neurological exam. Otherwise, she continued to display 5/5 strength throughout and her gait was intact. The claimant was to continue taking Depakote 1000 mg ER daily, her Depakote levels were to be monitored, and she was to follow up in two months. (Exhibit 5F/12-14) During her follow up with Dr. Almudallal in December 2014, she reported that her headaches had increased and were difficult to control. It was noted that there were other factors affecting her response and compliance. Following further discussions, the claimant and provider agreed to proceed with a referral to the headache clinic and her Depakote was refilled. (Exhibit 6F/4)[.]

An Initial Psychiatric Evaluation with Lindsay Ormsby, MD from Pathways dated April 16, 2015, noted that she was referred for

services by her provider, Kris Kauffman, CNP. The claimant reported that she had been having daily headaches for four to five weeks that impaired her sleep. She reported that her headaches have caused her financial stress and inability to work. She further indicated that she started experiencing sadness and anxiety four months prior when she ran out of money. She endorsed symptoms of depression such as strong desire to isolate, sadness, hopelessness, varied concentration, forgetfulness, and low energy. She also reported having passive suicidal ideations, wishing she were dead, but denied having any plans or intent. She also endorsed symptoms of anxiety, largely related to finances, but denied having panic attacks. She reported that she went to court for drug theft in April 2014 and was ordered to use no drugs or alcohol. She indicated that had been in substance abuse treatment for the past year and reported attending AA meetings. On exam, she appeared to have appropriate grooming and hygiene and appeared tired. She was pleasant and cooperative and made fair eye contact with the examiner. She was noted to have a slightly dysphoric and anxious mood affect although she smiled and conversed appropriately. Her judgment and insight were noted to be intact with a logical thought process. The claimant was assessed with alcohol abuse and adjustment disorder with anxiety and was assigned a GAF score of 60-65 (Exhibit 7F/1-5) The claimant was started on a trial of Zoloft and Ambien. (Exhibit 7F/6)[.]

The following month, the claimant was re-evaluated at Pathways by Dr. Ormsby. She reported having started the Zoloft but reported her mood was variable largely based on pain. She reported that she had not started the Ambien because she was afraid of becoming addicted to it. She continued to report poor sleep. On exam, she exhibited a euthymic affect and displayed good judgment and insight. She was assessed with depressive psychosis and generalized anxiety disorder. Her Zoloft was increased to 75 mg to treat her depression. (Exhibit 7F/7-9)[.]

In the same month, the claimant was also examined by Abdelhakim Hussein, MD regarding her headaches. She reported having headaches three to six times per week and that over the past few weeks she had a consistent headache. On exam, her pupils 4mm reacted briskly to 2mm, Cranial nerves III, IV, VI-EOM were full[,] with normal pursuit and saccade. She exhibited 5/5 motor strength all over, her coordination was intact, and she walked with a normal gait and station. However, during the exam, she was visibly crying and reportedly in pain. The claimant was assessed with a chronic migraine and depressive disorder. It was noted that her multiple reported syncopal spells could not be explained but that her

depression and anxiety disorders may be contributing to her daily headache. Due to tolerance issues with Depakote, she was advised to discontinue using Depakote and was started on Cambia, Pamelor, and Amerge. She was also instructed to keep a headache diary and was referred to the Cleveland Clinic Headache Clinic. (Exhibit 9F/4-6)[.]

In June 2015, an updated EEG was normal with no evidence of epileptiform activity appreciated. (Exhibit 8F/111-112)[.]

The claimant did not follow up with Dr. Hussein until October 2015 at which time she reported no improvement in her headaches with use of Pamelor and Amerge. She also reported that she had never used the Cambia as directed. She reported having headaches two to five times weekly that lasted for hours to days. She reported having nausea and vomiting with all of her headaches as well as some dizziness. However, she denied osmophobia, dysphasia, photophobia and phonophobia. She reported that she was taking Depakote on an as needed basis. Following an exam, it was noted that her headaches were likely attributed to her psychiatric disorder. She was advised to stop taking Pamelor, Cambia, and Amerge and was to maintain a headache diary. She was again referred to the Cleveland Clinic Headache Clinic. Dr. Hussein did not believe that he could help her further. (Exhibit 9F/1-3)[.]

In March 2016, the claimant attended an initial consult with the Cleveland Clinic neurologist, Luzma Cardona. It was noted that the claimant clearly remembered that her headaches started after she had an upper respiratory/sinus infection and shingles, which continued almost daily. She reported that she was having headaches four to five days per week which lasted anywhere from four hours to days with treatment. She reported that they are located at the top of her head and from her neck down to her shoulders with a pressure and squeezing quality. She identified no known triggers. She further reported experiencing nausea, neck pain, lightheadedness, and confusion. On exam, her pupils were equal, round, and reactive to light and she had full extraocular movements without nystagmus, and she had full strength in a shoulder shrug bilaterally. A motor exam revealed normal tone and 5/5 strength throughout and she was observed to walk with a normal gait. The claimant was assessed with new daily persistent headache for which she was offered medication trials of Amitriptyline, Nortriptyline, Propranolol, Atenolol, Gabapentin, Topiramate, Paxil, and Tizanidine and was given information regarding the imatch [*sic*] program. (Exhibit 15F)[.]

A telephone note between Jane Demattia, RN, at the Cleveland

Clinic, and the claimant dated April 2016 indicated that the claimant reported that she does have periods of pain free status which last for hours at a time. She reported her pain level as a 0 at the time of the call. (Exhibit 14F/1)[.]

Treatment notes from Kristine Kaufman, CNP in September 2016 indicate that the claimant reported that she was continuing to have headaches that last two hours to three to five days where she could not work due to pain. The claimant additionally complained of focal weakness, at times, and memory problems. On examination, the claimant appeared tired and in no distress. She was alert and oriented x 4, displayed a normal affect, and normal judgment. She exhibited intact strength in her upper and lower extremities and her gait was normal. The claimant's Trazadone was refilled[,] and the provider further noted that the claimant would be unable to perform any work duties due to her debilitating headaches. (Exhibit 12F/7-8)[.]

Thereafter, treatment notes reflect that the claimant followed up with Kristina Kauffman, CNP in August 2017 at which time she was requesting that a statement be provided for disability purposes indicating that there was nothing that could be done from a family practice standpoint for her condition. She reported that she was getting headaches seven days a week that varied in intensity. She further reported that she resides with a husband who is controlling and difficult to live with. She reported that no treatments had helped with her headaches but working out every day had seemed to help. She further reported that she was seeking a refill of Trazadone as it was helping a lot with her sleep. The claimant noted that the Cleveland Clinic recommend that she stay hydrated and Kristina Kauffman, CNP, noted that she was not drinking enough water. On exam, she appeared to be in no acute distress. The claimant was noted to have pain with palpation over L4, L5, and S1 sciatic joints with a mildly positive straight leg raise on the right. She reported that she was having right paresthesia down the right leg. The claimant was recommended to trial Flexeril and steroids for her low back pain. If there was no improvement, she was to consider physical therapy. As to her headaches, Ms. Kauffman noted that the claimant was unable to work due to her daily persistent headaches for which treatment was rest. (Exhibit 21F/16-17)[.]

…

In March 2019, the claimant reported to Kristina Kaufman, CNP that she was getting headaches once every four days that were being controlled with Tylenol or Ibuprofen and that the Flexeril helped with her back pain and helped her to sleep at night. However, she

was continuing to have back pain for which she was treating with pain management. The claimant's Flexeril was refilled and she was to continue treating with pain management for her back pain. (Exhibit 21F/40-41)[.]

In August 2019, the claimant followed up with Dr. Cardona at the Cleveland Clinic regarding her new daily persistent headaches. The claimant continued to report a reduction in the intensity of her headache when she is active in a regular exercise routine. The claimant was inquiring if there were any new therapies that she could try. Dr. Cardona noted that at the last visit he had recommended that she return to her local neurologist for medication trials, with which she had not followed through. Dr. Cardona's continued recommendation was that she follow up with a neurologist or primary care doctor to undergo trials of Amitriptyline, Nortriptyline, Propranolol, Atenolol, Gabapentin, Topiramate, Paxil, and Tizanidine. (Exhibit 22F)[.]

(ECF No. 14, PageID #: 702-08).

## 2.    Degenerative Disc Disease

Prior to the alleged onset date, the claimant underwent lap band placement due to morbid obesity in March 2012 by Rita Hadley, MD. (Exhibit 17F/26-28) In May 2013, following the procedure, an x-ray showed a lap band without evidence of reflux which was otherwise unremarkable. (Exhibit 17F/18)[.]

…

In January 2018, the claimant presented for an appointment with Dr. Peter Lalor with Bariatric Surgery. Treatment records indicate that she had a history of morbid obesity with a lap band placement in March 2012. She reported that she was suffering abdominal pain and continued to have reflux post lap band placement. She reported that she had been doing well since her last appointment in December 2017 at which time she was taking PPI and Carafate. She had since weaned off both medications and reported an increase in abdominal pain and reflux. On exam, she was easily palpable in the right upper quadrant and was not tender. She appeared to be in no apparent distress[,] and she denied any fevers or constitutional symptoms. It was noted that she had 3 mL of fluid in her band at this point of which 0.5 ml was removed. It was noted that her weight had remained stable and she was an appropriate candidate for EGD to rule out erosion and to evaluate her band further. In addition, she was to restart proton pump inhibitor therapy for life. (Exhibit 17F/1-

2)[.]

Treatment notes from Kristina Kaufman, CNP, in May 2018 indicate that the claimant was interested in reinstating her nursing license, which she lost in May 2014 due to an addiction to Dilaudid and[] having been accused of taking patient's medication. She reported that she underwent treatment in lieu of conviction[] and had been drug free since September 2011. She further reported that she was formerly taking Dilaudid due to back pain and had become addicted through a pain clinic. Assessment notes indicate that the claimant's headaches remained variant in nature and that Trazadone was helping her to sleep at night. (Exhibit 21F/34-35)[.]

In November 2018, the claimant presented for an appointment with Kristina Kauffman, CNP with reports of left sided low back pain for 3 days. The claimant reported that she had a L4-L5 fusion in the past and gets a cyst flare whenever she rides in a vehicle for long periods. During an examination, she appeared to be in no acute distress with pain over L4, L5, and S1 with range of motion. She had pain that radiated from the SI joint on the left lateral thigh that radiated down into the anterior portion of the upper thigh. The claimant was diagnosed with acute sciatica for which she was diagnosed a short burst of steroids and Ibuprofen. In addition, muscle relaxants were refilled[,] and she was to ice/stretch as needed. (Exhibit 21F/13-14) Additional treatment records indicate that she was referred to physical therapy by Kristina Kaufman, CNP due to degenerative disc disease with sciatica. (Exhibit 21F/61)[.]

Physical therapy records from Blanchard Valley Hospital indicate that the claimant participated in physical therapy due to acute sciatica in December 2018 and January 2019, which began after she was helping her daughter move. After two visits, she was discharged to a home exercise program at the claimant's request. (Exhibit 18F/6-18 and 21F/48)[.]

Later in January, the claimant presented for an appointment with Melissa Kay, CNP for an initial evaluation regarding back pain. She reported that she began having back pain 1.5 years prior and had completed a home exercise program with no symptom reduction. She reported that she was experiencing pain in the left low back with some groin pain and radiation into her left leg with paresthesia which she rated a 3-7 on scale of 10. She denied having any headaches, memory problems, anxiety, or depression. On exam, she appeared to be in no acute distress and appeared to have appropriate judgment, insight, mood[,] and affect. During a neuro exam her pupils were equal bilaterally and reactive to light. A motor exam

showed that she had 5/5 strength in her upper and lower extremities and walked with a steady gait and posture. She did, however, exhibit tenderness in the left paraspinal musculature and SI region with pain upon range of motion. In addition, she displayed a positive left straight leg raise at end range. (Exhibit 20F/1-4) The claimant was assessed with left lumbar radiculopathy and lumbago for which she was to have an[] MRI and X-rays completed. (Exhibit 20F/4) X-ray imaging of the claimant's lumbar spine showed moderate degenerative changes of the lumbar spine without radiographic evidence of acute bony abnormality. (Exhibit 18F/22 and 20F/15) An MRI of the lumbar spine in February 2019 showed mild to moderate degenerative changes and a moderate size left-sided paracentral disc extrusion at L4-L5 causing encroachment of the left sided L5 nerve root. It was further noted that this was superimposed on moderate disc bulge, mild to moderate endplate degenerative changes and moderate bilateral facet arthropathy, worse on the right. (Exhibit 18F/2-3 and 20F/13)[.]

(ECF No. 14, PageID #: 702, 707-08).

### C.      Opinion Evidence

#### 1.      State Agency Consultants

State agency psychological consultants, Dr. Cynthia Waggoner, PsyD and Dr. Paul Tangeman, PhD, found the claimant's affective disorder was non-severe. (Exhibits 2A and 4A) Limited weight is given to the opinions of Drs. Waggoner and Tangeman. Although their opinions were consistent with the evidence available to them at the time of the determination, when considered in combination with the claimant's headaches, and considering additional evidence received at the hearing level, the undersigned finds the claimant is more limited in her concentration and pace and in understanding, remembering, and applying information as set forth in the evaluation of the 'paragraph B' criteria above. Accordingly, limited weight is given to these reports, and the residual functional capacity assessing accounts for deficits in these area with limitations to understanding, remembering and carrying out only simple tasks that are not fast paced.

Little weight is also given to the State agency medical consultants, Dr. Michael Delphia, MD and Dr. Diane Manos, MD (Exhibits 2A and 4A) Both opined that the claimant does not have any exertional limitations. Although their evaluation was consistent with the evidence available at the time of their determinations, additional evidence received at the hearing level, indicates that the claimant

was diagnosed with degenerative disc disease of the lumbar spine, for which she underwent conservative treatment modalities. The undersigned [h]as reduced the claimant to work at the light exertional level taking this into consideration, but no further reduction in exertional level is warranted considering the evidence. During the hearing, she reported that she routinely exercises, which has helped reduce her headache intensity/frequency, and she reported that she lifts from 10 to 40 pounds. Additionally, subsequent examination findings note that she displayed pain and tenderness in the lumbar spine with range of motion and had positive straight leg findings. However, she was routinely noted to have 5/5 strength throughout and walked with a normal gait. These additional findings support the undersigned's findings that the claimant is limited to a light exertional level of work with the additional postural and environmental limitations included herein due to her combined impairments. As to her headaches, as the record indicates, the claimant failed to follow up with treatment through a local neurologist as recommended despite her reports of continued headaches and has shown an unwillingness to undergo further medication trials. (Exhibits 2F/6-7, 5F/12-14, 12F/7-8, 15F, 18F/22, 20F/1-4 and 15, 21F/16-17 and 40-41, 22F, and hearing testimony)[.]

(ECF No. 14, PageID #: 708-09).

### 2. Kaufman

Kristina Kauffman, CNP, completed a medical source statement, which indicates that the claimant has been diagnosed with new daily persistent headaches three to five times per week that last hours to days for which she takes Depakote and Trazadone. She opined that the claimant pain is severe enough to interfere with her attention and concentration frequently and constantly, however, she would be expected to be off task 0% of the work day. She further opined that the claimant is incapable of even low stress jobs, she can lift 'none' on a rarely, occasional, and frequent basis, she can rarely bend, stoop, and balance, she can never work around dangerous equipment, she is unable to tolerate exposure to heat, dust, fumes, and noise, and she cannot work with sudden headaches. Lastly, she opined that the claimant would be expected to be absent from work more than four days per month as a result of her impairments or treatment. (Exhibit 11F) She also completed a letter stating that the claimant's symptoms are debilitating[,] and no interventions have been found to alleviate her symptoms. (Exhibit 16F/1) She further noted in treatment notes that the claimant is unable to perform any work duties due to her debilitating headaches and would be

appropriate for disability. (Exhibit 12F/7-8) Additional treatment notes reflect that she re-emphasized these limitations or otherwise noted that the claimant was unable to work. (Exhibits 1F/25-27 and 31 and 21F/16-17) The undersigned assigns partial weight to the opinions of Kristina Kauffman, CNP. Although she is a treatment provider, her opinions infringe upon an issue that is reserved to the Commissioner. 20 CFR §404.1527(d) and §416.927(d) state that the final responsibility for determining if a claimant is 'disabled' or 'unable to work' is reserved for the Commissioner. Additionally, the suggested limitations conflict with the claimant's own hearing testimony that she is able to lift 10-40 pounds on the Nautilus machine and are also internally inconsistent regarding her attention and concentration. To the extent the suggested limitations are consistent and supported by the evidence, the undersigned has accounted for these limitations within the adopted residual functional capacity herein.

(ECF No. 14, PageID #: 709-10).

## IV.    The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact:

3. Through the date last insured, the claimant had the following severe impairments: new daily persistent headaches; lumbar degenerative disc disease; history of morbid obesity with lap-band surgery in March 2012; history of alcohol dependence; adjustment disorder with anxiety and depressed mood; and major depressive disorder (20 CFR 404.1520(c))…

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: occasional climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, and crawling; no exposure to unprotected heights or dangerous machinery; and capable of understanding, remembering, and carrying out simple tasks that are not fast paced meaning the pace of productivity is not dictated by an external source over which she has no control…

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a)…

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 3, 2013, the alleged onset date, through June 30, 2019, the date last insured (20 CFR 404.1520(g)).

(ECF No. 14, PageID #: 697-712).

## V.    Law and Analysis

### A.    Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*). If the Commissioner's decision is supported by substantial evidence, then it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* at *2 (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)). If there is competing substantial evidence, then the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen*, 800 F.2d at 545 ("An administrative decision is not subject to reversal merely because substantial evidence would have

supported an opposite decision."). Thus, the movant bears the burden of demonstrating that the ALJ's analysis *lacks* substantial evidence, not merely that substantial evidence supports her position. *See Greene ex rel. Greene v. Astrue*, No. 1:10-cv-414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack of substantial evidence by pointing to evidence … that supports her position. Rather, [a claimant] must demonstrate that there is not sufficient evidence … that would allow a reasonable mind to accept the ALJ's conclusion.").

### B.    Standard for Disability Determination

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C.    Discussion

Burkholder raises two issues here:

I. The ALJ's decision should be reversed and remanded because the ALJ's analysis of Ms. Burkholder's severe back impairment was improper under *Deskin*, and therefore was not supported by substantial evidence.[2]

II. The ALJ's decision should be reversed because the ALJ did not properly evaluate Ms. Kaufman's opinions and failed to properly account for Ms. Burkholder's severe new daily persistent headaches.[3]

(ECF No. 15, PageID #: 1093, 1098-1108).

### 1. The RFC Findings Concerning Burkholder's Postural and Exertional Limitations Are Supported by Substantial Evidence

In her first issue, Burkholder argues that the ALJ fashioned an RFC "that likely does not accurately reflect all of the associated limitations from Ms. Burkholder's degenerative disc disease." (ECF No. 15, PageID #: 1098). Burkholder states that the ALJ "evaluated the extent and severity" of that condition "without any medical source opinion in the record" to explain the functional limitations that may stem from it. (ECF No. 15, PageID #: 1098). Burkholder argues that doing so was "improper[]" under this District's holding in *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), because "the ALJ had to [have] interpret[ed] raw medical data in functional limitations" in order to fully consider the medical evidence when fashioning Burkholder's RFC. (ECF No. 15, PageID #: 1099). Thus, Burkholder argues that her claim should

---

[2] While the issue statement above is Burkholder's official issue statement on page one of her brief, she wrote a different issue statement in the body of her argument: "The ALJ's decision should be reversed because the ALJ improperly constructed an RFC that was not supported by substantial evidence under the standards of *Deskin*." (ECF No. 15, PageID #: 1098 (stylings edited)).

[3] Burkholder rephrased this issue statement, too, in the body of her argument: "The ALJ's decision should be reversed because the ALJ failed to properly evaluate the opinions of the treating nurse practitioner, Ms. Kaufman." (ECF No. 15, PageID #: 1103 (stylings edited)).

be remanded to the ALJ for further consideration of the functional limitations that may stem from her degenerative-disc-disease diagnosis. (ECF No. 15, PageID #: 1098-1100). To that end, Burkholder would have the ALJ "recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing" in order to more fully develop the record. (ECF No. 15, PageID #: 1098-1100) (quoting *Deskin*).

In response, the Commissioner argues that the RFC is supported by substantial evidence. (ECF No. 18, PageID #: 1123). As support for the argument, the Commissioner notes that the evidence of a functional limitation stemming from degenerative disc disease is "overwhelmingly benign." (ECF No. 18, PageID #: 1123). The Commissioner also notes that the ALJ thoroughly discussed Burkholder's degenerative disc disease (which the ALJ found to be a severe impairment) and contrasted it against the evidence that would cut against a finding that that impairment caused functional limitations, for example the fact that Burkholder "consistently exhibited normal gait, balance, range of motion, coordination strength, sensation, and reflexes during her physical examinations." (ECF No. 18, PageID #: 1123). The Commissioner states that the ALJ considered the record evidence that postdated the State Agency physical consultants' opinions "and ultimately found that greater limitations in the RFC were warranted as a result." (ECF No. 18, PageID #: 1125). Finally, the Commissioner argues that despite this District's holding in *Deskin*, the applicable regulations and 6th Circuit case law make it clear "that the ALJ—not any … physician[]—is ultimately responsible for evaluating the medical and non-medical evidence and determining the RFC." (ECF No. 18, PageID #: 1125). Thus, the Commissioner opposes remand.

### a. *Deskin* Is Distinguishable from Burkholder's Case

*Deskin* and its progeny concern the ALJ's duty to develop the record when that record demonstrates that the claimant has a severe impairment but lacks opinion evidence about how the

impairment might affect the claimant's residual functional capacity to work. *Deskin*'s facts (which

bear repeating here) have been well summarized in other decisions:

> In *Deskin*, the ALJ found the claimant suffered from the severe
> impairments of degenerative disc disease and fibromyalgia. *Deskin*,
> 605 F.Supp.2d at 909. None of Deskin's treating physicians
> provided a medical opinion, despite an extensive treatment history.
> *Id.* at 910. Rather, the sole medical opinion in the record was that
> prepared by a state agency reviewing physician. *Id.* The record
> before the ALJ, however, contained two years of medical records
> post-dating the state agency physician's opinion. *Id.* The ALJ did not
> order a consultative examination or have a medical expert testify at
> the hearing and, instead, 'proceeded to decide the case on his
> analysis of the medical records, giving only passing mention to [the
> state agency physician's] opinion.' *Id.*
>
> The Court determined [that] the RFC was not supported by
> substantial evidence 'because of the absence from the administrative
> record of a proper medical opinion as to Deskin's work-related
> limitations.' *Id.* at 910.

*Adams v. Colvin*, No. 1:14-CV-2097, 2015 WL 4661512, *13-14 (N.D. Ohio Aug. 5, 2015). The

lack of opinion evidence led the presiding judge to proscribe the ALJ's duty to augment the record:

> [If] the transcript contains only diagnostic evidence and no opinion
> from a medical source about functional limitations (or only an
> outdated nonexamining agency opinion), [then] to fulfill the
> responsibility to develop a complete record, the ALJ must re-contact
> the treating source, order a consultative examination, or have a
> medical expert testify at the hearing. This responsibility can be
> satisfied without such opinion only in a limited number of cases
> where the medical evidence shows 'relatively little physical
> impairment' and an ALJ 'can render a commonsense judgment
> about functional capacity.'

*Deskin*, 605 F. Supp. 2d at 912 (quoting *Manso-Pizarro v. Sec'y of Health and Hum. Servs.*, 76

F.3d 15, 17 (1st Cir. 1996)). The same judge later clarified the *Deskin* holding, explaining that

> *Deskin* sets out a narrow rule that does not constitute a bright-line
> test. It potentially applies only when an ALJ makes a finding of
> work-related limitations based on no medical source opinion or an
> outdated source opinion that does not include consideration of a
> critical body of objective medical evidence.

*Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-0025, 2011 WL 5024866, *2 (N.D. Ohio Oct. 21, 2011).

Analogous cases in this District have cited *Deskin* in support, including ones in which the ALJ unquestionably interpreted raw medical data concerning the claimant's mental impairments into an RFC finding. *E.g. McQuin v. Comm'r of Soc. Sec.*, No. 3:12-CV-1704, 2014 WL 1369674, *14 (N.D. Ohio Mar. 31, 2014). But *Deskin*'s analysis has also been called into question by this District. For instance, another judge stated that *Deskin* "is not representative of the law established by the legislature[] and interpreted by the Sixth Circuit Court of Appeals." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-CV-2080, 2010 WL 750222, *2 (N.D. Ohio Mar. 2, 2010); *accord Adams*, 2015 WL 4661512, at *12-13 (quoting *Henderson*); *Leflouria v. Berryhill*, No. 1:17-CV-157, 2018 WL 3105943, *7, n. 3 (N.D. Ohio Jan. 16, 2018); *Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19-CV-2844, 2020 WL 7769729, *10 (N.D. Ohio Dec. 30, 2020) (explaining that "*Deskin* has been criticized by other judges within this District"). Despite this negative treatment, it appears that *Deskin* "has not been overruled." *Leflouria*, 2018 WL 3105943 at *7, n. 3.

Burkholder's *Deskin* argument is unavailing for three reasons. First, Burkholder has not proven that her degenerative-disc-disease diagnoses compels greater postural or exertional limitations than those that the ALJ already found. It is well settled that a claimant must "prove … that [she is] blind or disabled." 20 C.F.R. § 404.1512(a)(1); *see also Deskin*, 605 F. Supp. 2d at 911 ("Unquestionably, the claimant bears the burden of proof as to the existence and severity of the limitations caused by her impairments."). To do so, "she must inform [the Commissioner] about or submit all evidence known to [her] that relates to whether or not [she is] blind or disabled…" 20 C.F.R. § 404.1512(a)(1). While the ALJ must "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [she] file[s her] application" (20 C.F.R. § 404.1512(b)(1)), the "ALJ's duty to develop the record is balanced

23

against the fact that '[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant.'" *Justice v. Comm'r of Soc. Sec.*, No. 1:13–cv–00836, 2014 WL 2803469, *11 (N.D. Ohio June 19, 2014) (quoting *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986)); *see also Jackson v. Comm'r of Soc. Sec.*, No. 4:13–CV–929, 2014 WL 2442211, *8 (N.D. Ohio May 30, 2014) ("[I]t is incumbent upon the claimant to provide an adequate record upon which the ALJ can make an informed decision regarding disability."). Despite acknowledging in her brief here that she bears that burden (ECF No. 15, PageID #: 1099), Burkholder has not explained to the Court how or if her degenerative-disc-disease diagnosis functionally limits her. At best, Burkholder hypothesizes that "a medical source opinion *may have* disagreed with the ALJ and found that Ms. Burkholder was not capable of performing light work and/or that Ms. Burkholder required additional physical limitations based on her inability to tolerate standing for longer than one hour." (ECF No. 15, PageID #: 1103 (emphasis added)). But Burkholder does not support that hypothesis. Moreover, Burkholder has long maintained that her social security claim "boil[ed] down to her headaches and the severity and the frequency" of them—not her degenerative disc disease. (ECF No. 14, PageID #: 724). Indeed, while the ALJ elicited Burkholder's testimony relating to her degenerative disc disease (ECF No. 14, PageID #: 725-26), Burkholder's counsel did not elicit *any* testimony about the diagnosis or any physical limitations that it might cause. (ECF No. 14, PageID #: 731-34). Nor did Burkholder's counsel elicit testimony from the vocational expert about a hypothetical individual with additional exertional or postural limitations caused by degenerative disc disease. (ECF No. 14, PageID #: 738). In short, Burkholder did not meet her burden of presenting evidence that her degenerative-disc-disease diagnosis calls for additional postural or exertional limitations.

24

Second, *Deskin* applies narrowly—and not to this case. Although *Deskin* proscribes the ALJ's duty to develop the record in certain circumstances (*see Kizys*, 2011 WL 5024866, at *2), Sixth Circuit case law makes it clear that an ALJ is not required to send a claimant for a consultative examination[4] or hire a medical expert to testify at the hearing[5] in all instances—those actions are within the ALJ's sound discretion. *See Jackson*, 2014 WL 2442211 at *9 ("[A]n ALJ is required to refer a claimant for such examinations only when the record establishes that it 'is necessary to enable the administrative law judge to make the disability decision.'" (quoting *Landsaw*, 803 F.2d at 214)). Even in light of *Deskin*, the pertinent inquiry remains whether there is "sufficient evidence in the record for the ALJ to evaluate the claimant." *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 562 (6th Cir. 2014). A close inspection of the record evidence and the ALJ's analysis of it demonstrates that there was sufficient evidence to make that determination here—which distinguishes Burkholder's case from *Deskin* and others like it. Whereas the MRIs in *Deskin* were described as showing "diffuse and substantial degenerative disc disease throughout Deskin's spine" (*Deskin*, 605 F. Supp. 2d at 913), the MRI results here state that Burkholder has only "[m]oderate degenerative changes of the lumbar spine without radiographic evidence of acute bony abnormality," the "vertebral body heights and alignment are within normal limits," with "[t]h disc spaces … maintained," and only "mild multilevel endplate degenerative changes." (ECF No. 14, PageID #: 988). A medical report summarizing those findings one week later used only the words "mild to moderate" and "moderate" to describe the degenerative changes to Burkholder's

---

[4] *See Landsaw*, 803 F.2d at 214 ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").

[5] *See Griffith*, 582 F. App'x at 562 ("[W]hile the ALJ must base his findings of fact and legal conclusions on medical information that has been provided, … solicitation of an expert medical opinion is discretionary.").

discs, too. (ECF No. 14, PageID #: 992). These results are contextualized by Burkholder's doctor's contemporaneous notes that her posture and base and stride were "normal" and her gate was "steady." (ECF No. 14, PageID #: 996). Together with Burkholder's testimony that her back pain had diminished significantly and that the residual pain that she did experience was "much, much less" and "sporadic," there was ample evidence in the record on which the ALJ could "render a commonsense judgment about [Burkholder's] functional capacity" without seeking an expert opinion to interpret the MRI results. *Deskin*, 605 F. Supp. 2d at 913.

Third, an underlying principle in cases like *Deskin* and *McQuin* is the ALJ's obligation to "explain the basis for her determinations[, such that] one [need not] … assume [that] the ALJ based her determinations on her own lay interpretation of the record." *McQuin*, 2014 WL 1369674 at *1; *c.f. Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996) for the proposition that if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even if it is supported by substantial evidence). In *Deskin*, the ALJ gave "only passing mention" to the only opinion evidence in the record and "ignor[ed]" that doctor's findings as to other functional limitations. *Deskin*, 605 F. Supp. 2d at 911-13. Thus, a subsequent reviewer could assume only that the ALJ had interpreted raw medical data in reaching his finding. *Id.* And in *McQuin*, the ALJ ignored opinions concerning the claimant's mental limitations because they were incomplete. *McQuin*, 2014 WL 1369674 at 13-14. Again, a subsequent reviewer could thus assume only that the ALJ had interpreted raw medical data in reaching her finding. *Id.* But here, the ALJ considered the State Agency physicians' opinions concerning Burkholder's physical limitations, adopted their postural limitations, determined that the record as a whole—the medical and non-medical evidence alike—compelled further exertional limitations due to Burkholder's

26

degenerative disc disease, and narrated that determination in a manner that a subsequent reviewer could follow and understand. (ECF No. 14, PageID #: 709). Thus, the ALJ built an adequate logical bridge between the medical and non-medical evidence and her ultimate finding concerning Burkholder's exertional and postural limitations, which distinguishes it from both *Deskin* and *McQuin*.

As this District has stated, the *Deskin* holding is not "a bright-line test." *Kizys*, 2011 WL 5024866 at *2. The Court here declines to treat it as one. Because the record of impairments in Burkholder's case is notably distinguishable from *Deskin* and its progeny, *Deskin* does not require remand in this instance.

### b. Substantial Evidence Supports the RFC's Postural and Exertional Limitations

Having concluded that the ALJ sufficiently developed the record, the Court next considers whether the ALJ's RFC finding is supported by substantial evidence. The claimant's RFC "is the most [that the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a). The RFC denotes "functional limitations and restrictions and … [the claimant's] remaining capacities for work-related activities." Soc. Sec. Ruling 96-08p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ must "assess[] 'an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Stewart v. Comm'r of Soc. Sec.*, 881 F. App'x 349, 355 (6th Cir. 2020) (quoting SSR 96-08p, at *1). The ALJ must "consider [the claimant's] ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(b)(4); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).

An RFC determination is a legal finding, not a medical determination; thus, an "ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(B)); *see also Nejat*, 359 F. App'x at

578 ("Although physicians opine on a claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 404.1546(c) ("[T]he administrative law judge … is responsible for assessing your residual functional capacity."). In doing so, the ALJ must evaluate, rather than interpret, the medical and non-medical evidence in the record. *Coldiron*, 391 F. App'x at 439.

Concerning Burkholder's physical limitations, the ALJ ultimately found that Burkholder could "perform light work as defined in 20 CFR 404.1567(b) except: occasional climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, and crawling; no exposure to unprotected heights or dangerous machinery." (ECF No. 14, PageID #: 700). The regulations define light work as

> involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

In her discussion of the facts of Burkholder's claim, the ALJ noted that Kaufman (whom Burkholder saw regularly) referred Burkholder to physical therapy for her degenerative disc disease in November 2018, and the ALJ narrated the medical records that touched on Burkholder's back pain. (ECF No. 14, PageID #: 707-08). For example, the ALJ wrote:

> Later in January [2019], the claimant presented for an appointment with Melissa Kay, CNP for an initial evaluation regarding back pain. She reported that she began having back pain 1.5 years prior and had completed a home exercise program with no symptom reduction.

28

> She reported that she was experiencing pain in the left low back with some groin pain and radiation into her left leg with paresthesia which she rated a 3-7 on scale of 10… A motor exam showed that she had 5/5 strength in her upper and lower extremities and walked with a steady gait and posture. She did, however, exhibit tenderness in the left paraspinal musculature and SI region with pain upon range of motion. In addition, she displayed a positive left straight leg raise at end range. (Exhibit 20F/1-4) The claimant was assessed with left lumbar radiculopathy and lumbago for which she was to have an[] MRI and X-rays completed. (Exhibit 20F/4) X-ray imaging of the claimant's lumbar spine showed moderate degenerative changes of the lumbar spine without radiographic evidence of acute bony abnormality. (Exhibit 18F/22 and 20F/15) An MRI of the lumbar spine in February 2019 showed mild to moderate degenerative changes and a moderate size left-sided paracentral disc extrusion at L4-L5 causing encroachment of the left sided L5 nerve root. It was further noted that this was superimposed on moderate disc bulge, mild to moderate endplate degenerative changes and moderate bilateral facet arthropathy, worse on the right. (Exhibit 18F/2-3 and 20F/13)[.]

(ECF No. 14, PageID #: 707-08). The ALJ also narrated Burkholder's 2019 testimony in which she stated that her back pain was now "much, much less" and "very sporadic." (ECF No. 14, PageID #: 701; 725-26). Burkholder further explained that she now maintains a regular exercise routine that includes walking and upper-body exercises on Nautilus machines, wherein she regularly lifts between 10 and 40 pounds. (ECF No. 14, PageID #: 701).

The ALJ accorded little weight to the State Agency consultants' opinions regarding Burkholder's physical limitations, noting that

> [a]lthough their evaluation was consistent with the evidence available at the time of their determinations, additional evidence received at the hearing level, indicates that the claimant was diagnosed with degenerative disc disease of the lumbar spine, for which she underwent conservative treatment modalities. The undersigned [h]as reduced the claimant to work at the light exertional level taking this into consideration, but no further reduction in exertional level is warranted considering the evidence.

(ECF No. 14, PageID #: 709). Although the ALJ determined from the record that Burkholder had

exertional limitations on which the State Agency consultants did not opine, the ALJ still adopted in the RFC the State Agency consultants' opinions about Burkholder's postural limitations by precluding her from climbing ladders, ropes, or scaffolds. (ECF No. 14, PageID #: 156, 167). The ALJ supported the other physical limitations in the RFC by recounting Burkholder's testimony about her ability to lift 10 to 40 pounds in her exercise routine, which generally comports with light work under 20 C.F.R. § 404.1567(b), and contrasting the medical notes that demonstrated Burkholder's spinal tenderness against the same medical notes that described her as having "5/5 strength throughout and walk[ing] with a normal gait." (ECF No. 14, PageID #: 710). Together, these facts demonstrate that the ALJ properly "consider [Burkholder's] ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(b)(4); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).

The Court concludes that the evidence concerning Burkholder's exertional and postural limitations is substantial because "a reasonable mind might accept [it] as adequate to support" the physical RFC finding. *Rogers*, 486 F.3d at 241. While there may be substantial evidence to support an alternative conclusion, the Court concludes that the ALJ was within her zone of choice in fashioning the exertional and postural portion of Burkholder's RFC. *Mullen*, 800 F.2d at 545. Because the postural and exertional portion of the RFC is supported by substantial evidence and that the ALJ built a logical bridge between the evidence and the RFC finding, it should not be disturbed. *Id.*

### 2. The ALJ's Findings Concerning Burkholder's New Daily Persistent Headaches Are Supported by Substantial Evidence

In her second issue, Burkholder attacks the ALJ's analysis and narrative of Kaufman's medical source statement, which the ALJ gave only partial weight. (ECF No. 15, PageID #: 1103-08). Burkholder acknowledges that Kaufman—a certified nurse practitioner—is not a treating

source under the applicable regulations and, thus, her opinions are not entitled to any specific weight. (ECF No. 15, PageID #: 1105). Nevertheless, Burkholder asserts that the ALJ should have given great weight to those opinions and treatment notes under the applicable factors at 20 C.F.R. § 404.1527(c). (ECF No. 1106-07). While Burkholder argues that each factor favors according greater weight, she asserts that her longtime and "extensive" treating relationship with Kaufman is a particularly strong factor. (ECF No. 15, PageID #: 1103, 1106-07). While Burkholder asserts that the RFC "does not accurately reflect the limitations associated with" Burkholder's headaches, she largely argues that the ALJ should have accorded greater weight to Kaufman's opinions; Burkholder does not specify what about the RFC is inaccurate, *i.e.*, what limitation the ALJ should have adopted that was not already included in the RFC. (*See generally* ECF No. 15, PageID #: 1103-08). The Court considers both arguments below.

In response, the Commissioner argues that the ALJ properly discounted various aspects of Kaufman's opinion, for example: statements about Burkholder's ultimate ability to do work, which are issues reserved to the Commissioner; inconsistencies between the Kaufman's opinion and Burkholder's testimony about Burkholder's ability to lift weights and how lifting impacted her headaches; internal inconsistencies between Kaufman's opinions and notes about Burkholder's pain causing concentration issues yet opining that Burkholder would not be off task at all due to her symptoms, or Kaufman's opinion that Burkholder was functionally disabled despite a lack of positive test results or objective signs of such limitations. (ECF No. 18, PageID #: 1129-30). Because of those reasons, the Commissioner argues that Burkholder really asks the Court to reinterpret the evidence and overrule the ALJ's findings, actions that are outside of the Court's purview under 42 U.S.C. § 405(g). (ECF No. 18, PageID #: 1130-31).

a.    **The ALJ Properly Considered Kaufman's Opinion and Treatment Notes Concerning Burkholder's New Daily Persistent Headaches**

A nurse practitioner, like Kaufman, is not an "acceptable medical source." (Soc. Sec. Ruling 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006) (*rescinded*[6] *by* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-03p, 2017 WL 3928298 (S.S.A. Mar. 27, 2017)). Thus, an ALJ is "not required to give [her] opinion any particular weight." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 249 (6th Cir. 2015). Nor must the ALJ give good reasons for the weight assigned to Kaufman's opinion, as the good-reasons standard "applies only to treating sources" as defined by the regulations. *Roberts v. Comm'r of Soc. Sec.*, No. 1:14-CV-355, 2015 WL 3936177, at *4 (W.D. Mich. June 26, 2015).  Nevertheless, information from "other sources," such as nurse practitioners, is important and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, at *2. Indeed, an ALJ may give greater weight to a non-acceptable medical source's opinion than he might to an acceptable medical source—even a treating source—if the facts of the case call for it. *Id.* at *3. But ALJs are not compelled to give any particular weight to non-acceptable-medical-source evidence. *Noto*, 632 F. App'x at 248-49.

In considering the opinion, the ALJ must weigh it based on the "facts in each case" and "adjudicate[ the claim] on its own merits based on a consideration of the probative value of the opinions." SSR 06-03p at *5. The Commissioner has provided for ALJs six guiding factors: (1) whether the opinion came from an examining source, with more weight going to it if so; (2) whether the opinion came from a source with whom the claimant had an established treatment

---

[6] The rescission affects only cases filed after March 27, 2017; thus, SSR 06-03p applies here.

relationship, with more weight going to it if so; (3) whether other evidence supports the opinion,

with more weight going to a well-supported opinion; (4) whether the opinion is consistent with

other evidence in the record as a whole, with more weight going to a consistent opinion; (5)

whether the provider is a specialist or a generalist in the area on which they opined, with more

weight going to a specialist's opinion; and (6) any other factors that tend to support or refute the

opinion. *Id.* at *3 (citing 20 CFR §§ 404.1527(c), 416.927(c)). The ALJ need only consider the

relevant factors, and the ALJ "generally should explain the weight given to opinions for these other

sources, or otherwise ensure that the discussion of the evidence in the determination or decision

allows a claimant or subsequent reviewer to follow the adjudicator's reasoning…" SSR 06-03p, at

* 6.

   As another opinion within this District put it:

> Given this guidance, it will rarely be enough for the commissioner
> to silently consider the above-mentioned factors in deciding how
> much weight to give to an 'other source' who has seen the claimant
> in the source's professional capacity. Rather, the Sixth Circuit has
> repeatedly recognized that the commissioner must make an adequate
> record of the commissioner's consideration of an 'other source' who
> has seen the claimant in the source's professional capacity. Still, so
> long as the ALJ addresses the opinion from an 'other source' and
> gives reasons for crediting or not crediting the opinion, the ALJ has
> complied with the regulations.

*Hirko v. Colvin*, No. 1:15cv580, 2016 WL 4486852, at *3 (N.D. Ohio Aug. 26, 2016) (cleaned

up). The court in *Hirko* pointed found that the ALJ had not fulfilled her duty to explain her

reasoning because she "failed to even mention the other source opinions offered by claimant." *Id.*

at *4. Indeed, "mere[ly] cit[ing] to the opinions of [an "other" source] is not sufficient to satisfy

SSR 06–03P…" *Id.* (quoting *Boran ex rel. S.B. v. Astrue*, No. 1:10CV1751, 2011 WL 6122953, at

*14 (N.D. Ohio Nov. 22, 2011)). Similarly, merely stating that the other source opinion derives

from one who is "neither a medical doctor nor a vocational expert, and thus lacks the credentials

33

for making such a determination" without any other analysis will not suffice. *Cruse v. Comm'r of Soc. Sec.*, 502 F. 3d 532, 541 (6th Cir. 2007).

The Court concludes that the ALJ properly considered Kaufman's opinions and treatment notes and narrated her reasons for giving them only partial weight in a manner that a subsequent reviewer can follow her reasoning. As an initial point, the ALJ correctly stated that Kaufman opined on issues that are reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d) (explaining that the Commissioner gives no special significance to an opinion stating that the claimant is "disabled" or "unable to work" because that determination is reserved to the Commissioner); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is the [Commissioner's] prerogative …, not the treating physician['s].") (citation omitted). Thus, the ALJ's decision to reject Kaufman's notes and opinions to the extent that they described Burkholder as unable to work or otherwise a good candidate for disability benefits was not error. (*E.g.* ECF No. 14, PageID #: 645, 653-54, 938).

Far from silently considering Kaufman's treatment notes and opinion, the ALJ extensively narrated those records as they pertained to Burkholder's headaches. (ECF No. 14, PageID #: 702-08). In those narratives, the ALJ pointed out that Kaufman discussed Burkholder's frequent and long-lasting headaches that caused her pain for hours or even days. (*E.g.* ECF No. 14, PageID #: 706). The ALJ noted that Kaufman was "a treatment provider" who had examined Burkholder, but then stated that Kaufman's "suggested limitations conflict with the claimant's own hearing testimony that she is able to lift 10-40 pounds on the Nautilus machine and are also internally inconsistent regarding her attention and concentration." (ECF No. 14, PageID #: 710). Kaufman had stated in her opinion that Burkholder "can lift [no weight] on a rarely, occasional, and frequent basis," the rationale being that she suffers from headaches. (ECF No. 14, PageID #: 710 (citing

34

ECF No. 14, PageID #: 645)). Burkholder's 2019 testimony about her ability to lift clearly belies that opinion. The internal inconsistency that the ALJ pointed out was that Kaufman "opined that [Burkholder's] pain is severe enough to interfere with her attention and concentration frequently and constantly, however, she would be expected to be off task 0% of the work day." (ECF No. 14, PageID #: 709-10 (citing ECF No. 14, PageID #: 645)). Finally, the ALJ stated, "To the extent the suggested limitations are consistent and supported by the evidence, the undersigned has accounted for these limitations within the adopted residual functional capacity herein." (ECF No. 14, PageID #: 710).

Together, these narratives highlight the salient points under the relevant factors, which satisfies the ALJ's burden of explaining why she gave only partial weight to Kaufman's opinion. *Hirko*, 2016 WL 4486852, at *3. Ultimately, the ALJ's analysis is entitled to deference, and the ALJ did not fail to follow the Commissioner's procedures here. *Id.* Accordingly, the ALJ did not err in giving only partial weight to Kaufman's opinion, and that weight finding should not be disturbed.

> **b.** **The ALJ Properly Rejected the Additional RFC Limitations in Kaufman's Opinion Relating to Burkholder's New Daily Persistent Headaches**

Concerning the effect of Kaufman's opinions and notes on the RFC, Burkholder states that the "residual functional capacity does not account for a majority of the limitations associated with Ms. Burkholder's new daily persistent headaches." (ECF No. 15, PageID #: 1104). For instance, Burkholder notes that Kaufman opined that Burkholder's "attention and concentration would be frequently to constantly impaired and that she would be incapable of even low stress work." (ECF No. 15, PageID #: 1105 (citing ECF No. 14, PageID #: 644)). And Burkholder notes that Kaufman opined that Burkholder "was precluded from lifting, could never work around dangerous

equipment, has visual and environmental limitations." (ECF No. 15, PageID #: 1105 (citing ECF No. 14, PageID #: 645)). Finally, Burkholder notes that Kaufman opined that Burkholder "would be absent for more than 4 days per month." (ECF No. 15, PageID #: 1105 (citing ECF No. 14, PageID #: 646)).

As discussed above, a claimant's RFC "is the most [that she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a). In fashioning Burkholder's RFC, the ALJ limited Burkholder to:

> light work…except: occasional climbing ramps and stairs; no climbing ladders, ropes or scaffolds; occasional stooping, kneeling, crouching, and crawling; no exposure to unprotected heights or dangerous machinery; and capable of understanding, remembering, and carrying out simple tasks that are not fast paced meaning the pace of productivity is not dictated by an external source over which she has no control.

(ECF No. 14, PageID #: 701). "The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC based on all of the relevant medical and other evidence" of record. *Harris v. Comm'r of Soc. Sec.*, No. 1:13–cv–00260, 2014 WL 346287, at *11 (N.D. Ohio Jan. 30, 2014). Thus, even if an ALJ accords great weight to an opinion, "an ALJ is not necessarily required to adopt wholesale limitations contained" therein. *Id.*

The Court concludes that the ALJ properly discounted the additional limitations discussed above that stem from Kaufman's opinions; thus, she was not obligated to include them in the RFC. The ALJ properly explained that Kaufman's opinions that described Burkholder's ability to lift and whether she would be off task were inconsistent with the rest of the medical record and Burkholder's own testimony. Thus, the ALJ was not obligated to adopt those inconsistent limitations. And while the ALJ did not explicitly state why she did not find that Burkholder would be absent from work four or more days per month (as Kaufman opined), the ALJ's decision

contains implicit[7] reasons for rejecting that opinion, such as noting that Burkholder is "able to do laundry and dishes, pieced out throughout the day" even as she experiences headache symptoms (ECF No. 14, PageID #: 701) and that she "routinely exercises, which has helped reduce her headache intensity/frequency." (ECF No. 14, PageID #: 709). These reasons are substantial evidence because a reasonable mind might accept them as adequate support for the ALJ's finding. *Rogers*, 486 F.3d at 241.

Accordingly, substantial evidence supports the ALJ's RFC findings concerning Burkholder's headaches, and the ALJ built a logical bridge between the evidence—which includes Kaufman's treatment notes and medical source statement—and her reasons for finding those limitations. *Fleischer*, 774 F. Supp. 2d at 877. Thus, the ALJ's RFC finding should not be disturbed. *Mullen*, 800 F.2d at 545.

## VI.     Recommendation

Because the ALJ followed proper procedures and her decision is supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

DATED: June 14, 2021

*Carmen Henderson*

—————————————————————————
Carmen E. Henderson
United States Magistrate Judge

---

[7] An ALJ's narrative can be sufficient even though it is "brief" (*Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009)), "indirect[]" (*Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 471 (6th Cir. 2006)), or implied. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) ("[I]t is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.").

_____

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).